**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| FOUNDERS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 2:13-cv-03035-DCN |
| RICHARD RUTH'S BAR & GRILL LLC, | ) | |
| RICHARD RUTH, SR., JANE RUTH, | ) | |
| and GEORGE GIANNARAS, *as guardian* | ) | |
| *for* EMMANUEL KEHAGIAS, | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| RICHARD RUTH'S BAR & GRILL LLC, | ) | |
| RICHARD RUTH, SR., and JANE RUTH, | ) | |
| and GEORGE GIANNARAS, as guardian | ) | No. 2:14-cv-03272-DCN |
| for EMMANUEL KEHAGIAS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| FOUNDERS INSURANCE COMPANY, | ) | |
| BROWN & BROWN, INC., UTICA | ) | |
| MUTUAL INSURANCE COMPANY, | ) | |
| and HULL & COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

This matter comes before the court on declaratory judgment action (2:13-cv-03035-DCN) defendant and bad faith action (2:14-cv-03272-DCN) plaintiff George Giannaras as Guardian for Emmanuel Kehagias's ("Kehagias") motion for partial summary judgment, ECF No. 155, and declaratory judgment action plaintiff and bad faith action defendant Founders Insurance Company's ("Founders") motion for summary

judgment, ECF No. 159.  For the reasons set forth below, the court denies Kehagias's

motion and grants Founders's motion.

## I.  BACKGROUND[1]

This is a consolidated matter that involves two separate but related actions.  The

first is a declaratory judgment action, 2:13-cv-03035, in which plaintiff Founders

requests that the court declare that it is not required to provide coverage under a general

liability policy ("the Policy")[2] because the insureds failed to provide timely notice of the

underlying personal injury lawsuit.  The second action is a bad faith action, 2:14-cv-

03272, filed by declaratory judgment action defendants and bad faith action plaintiffs

Richard Ruth's Bar & Grill LLC ("Richard's Bar"), Richard Ruth, Sr. ("Mr. Ruth"), Jane

Ruth ("Ms. Ruth") (collectively "the Ruths"), and Kehagias, as the Ruths' assignee,

---

[1] Founders and Utica filed a motion for leave to file a joint concise statement of undisputed material facts ("SUMF") on October 14, 2015 in "an effort to streamline its submissions and avoid duplication."  ECF No. 156.  The motion contains 56 exhibits. ECF No. 157.  Founders cites the SUMF within the various motions in support of its factual contentions and arguments.  On November 11, 2015, the Ruths and Kehagias filed a response in opposition to Founders's motion to file a joint concise statement.  The Ruths and Kehagias do not oppose the motion but do not concede that they agree that the facts contained therein are undisputed.  Indeed, the Ruths contend that many of the facts are disputed.  However, the Ruths do not dispute Founders's ability to file the motion. ECF No. 177.  The court grants Founders's motion to file the joint concise statement but will not consider the facts contained therein as undisputed.  Given that there are two docket numbers in this case and the parties have filed countless submissions and exhibits, the court will refer to the exhibits attached to Founders's motion, ECF No. 157, within this order.  Therefore, a direct citation to an Exhibit refers to the exhibits contained and numbered in ECF No. 157 under docket 2:13-cv-3035.

[2] Founders does not sell insurance policies directly to consumers.  Rather, an insurance wholesaler markets and sells the policies through local independent agents. The Ruths purchased their Policy from the Cherie Dumez Agency.  The Policy was procured by an insurance wholesaler known as Hull & Company, Inc. ("Hull"), a defendant in the bad faith action.  Hull is a wholesale broker of insurance.  ECF No. 43, Kehagias Am. Compl. ¶ 14.

alleging that Founders, Utica Mutual Insurance Company ("Utica"),[3] Hull & Company, Inc. ("Hull"), and Brown & Brown, Inc. ("Brown")[4] failed to properly handle the underlying personal injury claim.[5]

On September 29, 2012, a patron of Richard's Bar struck Kehagias during a pool game, and Kehagias suffered severe injuries and permanent brain damage as a result. After the incident, George Giannaras ("Giannaras"), Kehagias's brother-in-law, was appointed to serve as Kehagias's Guardian. On November 21, 2012, the Anastopoulo Law Firm sent Mr. Ruth a letter ("notice letter") notifying him that Kehagias retained the firm to represent him in connection with the injuries he sustained at the bar. Kehagias's Mot. Summ. J. Ex. 1. The notice letter asked that Mr. Ruth "[p]lease forward this letter to any and all insurance carriers with policies applicable to Richard's Bar and Grill, Richard Ruth, and the building housing Richard's Bar and Grill immediately." Id. On November 26, 2012, Ms. Ruth sent the notice letter to their local agent, Cherie Dumez ("Dumez") at the Cherie Dumez Agency. Ex. 17. The following day, Dumez emailed the notice letter to Hull. Ex. 18. Kehagias filed the underlying injury suit on December 19, 2012 in the Court of Common Pleas for the Ninth Judicial Circuit.[6] Ex. 7. Ms. Ruth was served with the Summons and Complaint on January 8, 2013.[7] Dumez emailed the notice letter to Hull a second time on January 9, 2013. Ex. 19.

---

[3] Founders is a wholly-owned subsidiary of Utica. Am. Compl. ¶ 10, ECF No. 89, 2.

[4] Hull is a subsidiary of Brown. ECF No. 96, at 3.

[5] The Ruths assigned their right to sue in a bad faith action to Kehagias on May 28, 2014. Ex. 49

[6] In the underlying personal injury suit, Kehagias asserted claims for negligence, assault and battery, negligent security, and gross negligence. See Ex. 7.

[7] Notably, Ms. Ruth is not the registered agent of Richard's Bar and is not authorized to receive service on behalf of Richard's Bar. Further, Ms. Ruth is not a

Kehagias contends that the Ruths notified Dumez and that Dumez in turn notified Hull, the insurance broker. Kehagias further contends that "Hull either failed to forward the letter to Founders, or, if they did, Founders failed to process it." Kehagias Mot. for Summ. J. 7. Neither the Ruths, nor anyone on their behalf, filed an answer, and on February 22, 2013, the court entered an Order for Entry of Default against the Ruths in the underlying action. Ex. 26. Founders received notice of the underlying lawsuit on May 15, 2013 when Hull sent the notice letter to Founders. Ex. 20 (email from Hull to Founders describing the claim as a "new claim" and requesting the "claim number ASAP as the agent originally submitted in January"). Founders disputes Kehagias's claims that the Ruths notified Dumez after being served and that Dumez notified Hull. Founders's Resp. 5 n.5. Upon receiving notice, Founders assigned the claim to adjustor Carlos Ortiz ("Ortiz"), and he began an investigation. Founders "escalated" the claim after learning of the severity of the injuries, opened a separate "coverage" file, and assigned adjustor Alberta Squalls ("Squalls") to investigate the late notice issue.

On May 22, 2013, J.D. Smith ("Smith"), retained by Founders to represent the Ruths in the underlying action, filed a motion to set aside the default. On August 27, 2013, the Anastopoulo Law Firm sent an offer of compromise ("Offer") to Smith. Ex. 33. The letter included a demand "for payment of policy limits" and stated: "At 5:00 p.m. EDT on September 9, 2013, this offer will be withdrawn and we will obtain an excess judgment against your insured." Id. The offer did not include a specific amount

---

member of the LLC, nor does she have any ownership interest in the LLC. Founders disputes that Richard's Bar was properly served. However, in the order denying Founders's motion to set aside default in the underlying personal injury lawsuit, Judge Nicholson stated: "This Court finds based on the evidence submitted by Plaintiff, that Mrs. Ruth was an agent and manager of the Defendant Richard Ruth's Bar and Grill, and that service was thereby effectuated." Kehagias's Mot. for Summ. J. Ex. 10, at 2.

and stated that "[i]f any condition is not met, or if any additional condition is imposed by [Founders], including but not limited to conditions of indemnification or the waiver of any rights or claims not specified herein, this offer of compromise will be withdrawn." Id.  In response to the Offer, Smith sent Kehagias's attorney an email inquiring about the specific amount demanded, stating:  "I understand that this policy has limits of $50,000 and want to make sure we are on the same page with the limits before I forward the demand to the carrier."  Ex. 35.  Kehagias's attorney responded that he understood the policy limits to be $1,005,000.00 and was therefore demanding that amount.  Id.

On September 3, 2013, Squalls responded to the offer of compromise, rejecting the offer but providing a counteroffer of $50,000.00.  Ex. 40.  On September 10, 2013, Kehagias's attorney sent a notice of the withdrawal of the offer of compromise because no payment had been received.  Ex. 42.  On October 29, 2013, Squalls sent Kehagias's attorney a second offer of compromise.  Ex. 50.  Squalls stated that "[b]ased on [Founders's] re-examination of its Policy provisions as may apply to this claim, Founders has determined that the maximum available coverage which could potentially be afforded to its insureds" was $105,000.00.  Id.  Kehagias's attorney never responded to Founders's second offer.  Kehagias filed an opposition to the Ruths' motion to set aside the entry of default on October 24, 2013, and the state court conducted a hearing on the motion on October 30, 2013.  Founders filed the present declaratory judgment action on November 6, 2013.

On January 17, 2014, Judge Nicholson denied the Ruths' motion to set aside the entry of default in the underlying state court action.  Ex. 45.  Judge Newman held a damages hearing on March 19, 2014, and on April 29, 2014, entered a default judgment

against the Ruths in the amount of $5,000,000.00. Ex. 55. At the Ruths' request, Smith

appealed Judge Newman's default judgment on May 28, 2014. That same day, the Ruths

executed an agreement with Kehagias under which Kehagias agreed not to execute the

judgment against the Ruths, and the Ruths assigned their right to sue Founders and Hull

for bad faith to Kehagias. Ex. 49.[8] On May 29, 2014, one day after the assignment, the

Ruths' personal counsel advised Founders that the Ruths no longer wished to appeal. Ex.

50. Kehagias, as the Ruths' assignee, filed the bad faith action on August 14, 2014.[9] On

August 20, 2014, the Ruths' personal counsel directed Founders to dismiss the appeal.

Ex. 52. Founders thereafter authorized Smith to dismiss the appeal in accordance with

the Ruths' request. Ex. 53.

Kehagias filed a partial motion for summary judgment in the declaratory

judgment action on October 14, 2015. ECF No. 155, at 2–3.[10] Founders also filed a

motion for summary judgment in the declaratory judgment action on October 14, 2015.

---

[8] Notably, as discussed below, the Ruths did not assign their right to sue Utica or Brown. Ex. 49.

[9] Kehagias brings the following claims in his bad faith action: (1) breach of contract for failure to defend and timely pay the policy limits, Kehagias's Am. Compl. ¶¶ 58–65; (2) negligence/gross negligence in processing the claim because Hull received the November 12, 2012 letter from the Anastopoulo Law Firm but Hull and Founders failed to properly process and handle the letter, id. ¶¶ 67–73; (3) bad faith failure to properly and effectively investigate the claim and failure to settle the claim within the policy limits and failure to otherwise act as a reasonable and prudent insurance company under the circumstances, id. ¶¶ 78–102; and (4) negligence per se for violation of S.C. Code Ann. § 38-47-10, which requires an insurance adjuster to be licensed in South Carolina, id. ¶¶ 104–115.

[10] In his motion for summary judgment, ECF No. 155, Kehagias specifically argues that: (1) South Carolina law controls this action; (2) Founders failed to establish substantial prejudice as a matter of law; (3) the Assignment from the Ruths to Kehagias is valid; (4) the Ruths acted reasonably and in good faith; and (5) Kehagias's prayer for punitive damages and attorney's fees is not unconstitutional.

ECF No. 159.[11]  On October 22, 2014, Founders dismissed the appeal, Ex. 54, and a final judgment was entered on November 25, 2014, Ex. 55.

Founders asks this court to declare that it is not required to indemnify the Ruths because they breached their duty to provide notice of the underlying claim and to forward the legal documents from the underlying suit.  Founders alternatively asks that, should the court find that it must indemnify the Ruths, the court declare that the amount of coverage is limited to $105,000.00.  The Ruths and Kehagias (hereafter collectively "Kehagias") filed a joint response in opposition to the motion on November 12, 2015.  ECF No. 180.  Founders filed a joint response in support of various motions on December 1, 2015.  ECF No. 193.  Founders and Utica (referred to collectively in this order as "Founders") filed a joint response in opposition to Kehagias's motion for summary judgment on November 12, 2015.[12]  The motions have been fully briefed and are ripe for the court's review.

## II.  STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Rule 56(c) of the Federal Rules of Civil Procedure requires that

---

[11] Founders filed a separate summary judgment motion pertaining to Kehagias's counterclaims for misrepresentation and gross negligence relating to Founders's refusal to pay the medical payments limits ("Med-Pay") coverage.  See ECF No. 164.  The court will address that motion in a separate order.

[12] Because the issues involved in Kehagias's and Founders's motions substantially overlap, the court will dispose of both motions in one order.  Further, many of the issues in the cases overlap and are discussed by the parties in filings relating to multiple motions.  The court's discussion and determination of issues, claims, and counterclaims in one order shall apply to all relevant motions and the arguments made therein.

the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Any reasonable inferences are to be drawn in favor of the nonmoving party. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence to overcome summary judgment. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp., 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### B.    Contract Construction

Under South Carolina law, "'[i]nsurance policies are subject to the general rules of contract construction.'" USAA Property & Cas. Ins. Co. v. Clegg, 661 S.E.2d 791, 797 (S.C. 2008) (quoting B.L.G. Enters., Inc. v. First Fin. Ins. Co., 514 S.E.2d 327, 330 (S.C. 1999)). "'Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning.'" Id. (quoting Sloan Constr. Co. v. Centr. Nat'l Ins. Co. of Omaha, 236 S.E.2d 818, 819 (S.C. 1977)). "'When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used.'" Id. (quoting B.L.G. Enters., Inc., 514 S.E.2d at 330). However, "'[a]mbiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer.'" Id. (quoting Diamond State Ins. Co. v. Homestead Indus., Inc., 456 S.E.2d 912, 915 (S.C. 1995)); see also Edens v. S.C. Farm Bureau Mut. Ins. Co., 308 S.E.2d 670, 671 (S.C.1983) ("Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted.").

"An insurer's obligation under a policy of insurance is defined by the terms of the policy itself and cannot be enlarged by judicial construction." Penn. Nat'l Mut. Cas. Ins.

Co. v. Lewis, 105 F. Supp. 3d 573, 583 (D.S.C. 2015), aff'd sub nom. 2016 WL 3033203, at *1 (4th Cir. May 27, 2016) (citing S.C. Ins. Co. v. White, 390 S.E.2d 471, 474 (S.C. Ct. App. 1990)). "A policy clause extending coverage must be liberally construed in favor of coverage, while insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." Id. (citing M & M Corp. of S.C. v. Auto–Owners Ins. Co., 701 S.E.2d 33, 35 (2010); Owners Ins. Co. v. Clayton, 614 S.E.2d 611, 614 (2005)). "However, if the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend coverage that was never intended by the parties." S.C. Farm Bureau Mut. Ins. Co. v. Wilson, 544 S.E.2d 848, 850 (S.C. Ct. App. 2001).

## III.   DISCUSSION

Founders argues that the court should grant its motion for summary judgment and declare as a matter of law that it is not required to indemnify the Ruths because they breached their obligations under the Policy to provide notice, which substantially prejudiced Founders. Alternatively, Founders argues that the court should declare that even if it is required to indemnify the Ruths, the policy limits are $105,000.00. In his partial motion for summary judgment, Kehagias makes the following arguments: (1) Founders has failed to establish prejudice as a matter of law and therefore cannot avoid coverage for insufficient notice; (2) the assignment to Kehagias is valid; (3) the Ruths acted reasonably, in good faith, and were not negligent as a matter of law; and

(4) Kehagias's request for attorney's fees is not unconstitutional as a matter of law.[13]  The

court will address the parties' arguments in turn.

### A.    Notice

Founders first argues that because the Ruths breached their duty under the policy

to notify Founders of the claim and to send the legal documents to Founders, causing

Founders substantial prejudice, it is not required to provide coverage under the Policy.

Founders's Mot. for Summ. J. 11.  In response, Kehagias first argues that the Ruths <u>did</u>

provide notice to Dumez.  ECF No. 180, 3–4.  Kehagias alternatively contends that even

if the Ruths breached their duty under the Policy to provide Founders notice, Founders

cannot establish substantial prejudice as a matter of law.  <u>Id.</u> at 4–10.

A plaintiff's duty to provide notice of a suit is a covenant under the Policy.

<u>Episcopal Church in S.C, v. Church Ins. Co. of Vermont</u>, 53 F. Supp. 3d 816, 828 (D.S.C.

2014).  "As a general rule, breach of an insurance policy's notice clause automatically

relieves the insurer of its obligations under the contract, including the payment of

proceeds due, and the duty to defend and to indemnify the insured."  <u>Wright v. UNUM</u>

<u>Life Ins. Co.</u>, No. 2:99-2394-23, 2001 WL 34907077, at *2 (D.S.C. Aug. 31, 2001).

"Where a question exists as to the failure of an insured to comply with the notice

requirements contained in a liability insurance contract, the burden of proof rests with the

insurer."  <u>Vt. Mut. Ins. Co. v. Singleton</u>, 446 S.E.2d 417, 421 (S.C. 1994) (citing <u>Squires</u>

<u>v. Nat'l Grange Mut. Ins. Co.</u>, 145 S.E.2d 673 (S.C. 1965); <u>Pharr v. Canal Ins. Co.</u>, 104

S.E.2d 394 (S.C. 1958)).  "'No rule of law is more firmly established in this jurisdiction

---

[13] Kehagias also argued that South Carolina law controls.  Founders and Utica stipulate that South Carolina law controls the claims in the consolidated action; therefore, the court need not address that argument.  Founders's Resp. 7; Dec. 14 Hr'g Tr. 3:6–8.

than that one suing on a policy of insurance, where the <u>notice required by the policy</u> is not timely given, cannot recover . . . .'" <u>Prior v. S.C. Med. Malpractice Liab. Ins. Joint Underwriting Ass'n</u>, 407 S.E.2d 655, 657 (S.C. Ct. App. 1991) (quoting <u>Lee v. Metro. Life Ins. Co.</u>, 186 S.E. 376, 381 (S.C. 1936)) (emphasis added).

"The purpose of a notification requirement is to allow for investigation of the facts and to assist the insurer in preparing a defense." <u>Vt. Mut. Ins. Co.</u>, 446 S.E.2d at 421 (citing <u>Washington v. Nat'l Serv. Fire Ins. Co.</u>, 168 S.E.2d 90 (1969)). Although the failure of an insured to comply with a notice requirement may bar recovery by the insured, <u>Squires,</u> 145 S.E.2d at 677, "[w]here the rights of innocent parties are jeopardized by a failure of the insured to comply with the notice requirements of an insurance policy, the insurer must show substantial prejudice to the insurer's rights" before recovery is barred. <u>Vt. Mut. Ins. Co.</u>, 446 S.E.2d at 421.

The General Liability ("GL") portion of the Policy states that the Ruths have the following duties in the event of an occurrence, offense, claim, or suit: "You must see to it that we are notified <u>as soon as practicable</u> of an 'occurrence' or an offense which may result in a claim." ECF No. 168 Ex. B (emphasis added). The Policy further states that "[i]f a claim is made or 'suit' is brought against an insured, you must . . . notify us as soon as practicable. You must see to it that we receive <u>written</u> notice of the claim or 'suit' as soon as practicable. You and any other involved insured must . . . <u>immediately</u> send us copies of any demands, notices, summonses, or legal papers received in connection with the claim or 'suit' . . . ." <u>Id.</u> (emphasis added). The Liquor Liability ("LL") portion of the Policy is even more specific and states that the insured must "[n]otify us by telephone at 888-676-4342 within seventy-two (72) hours; and provide

written notice to us at 1645 East Birchwood Avenue, Des Plaines, Illinois 60018 within

seventy-two (72) hours." Id. Ex. C. The LL portion of the Policy further states that

"[y]ou and any other involved 'insured' must . . . [p]rovide us copies of any demands,

notices, summonses, or legal papers received in connection with the claim or 'suit' within

seventy-two (72) hours." Id.[14]

Kehagias now contends that Jane Ruth gave the suit papers to Dumez shortly after

being served. ECF No. 179, Ex. 2, Ruth Aff. ¶ 30. Notably, Judge Nicholson denied

Founders's motion to set aside the entry of default, concluding that the Ruths' "inability

to recall whether they returned the Complaint over to the local agent does not rise to the

level of good cause" sufficient to grant the motion. ECF No. 155 Ex. 10. In her

deposition, Ms. Ruth testified that she notified Dumez when she received the November

21, 2012 letter from the Anastopoulo Law Firm and faxed the letter to her. ECF No. 157

Ex. 4, Ms. Ruth Dep. 40:17–25. Dumez testified that she sent the letter to Melanie Yount

("Yount") at Hull. Dumez Dep. 39:25–403. On January 4, 2013, Dumez sent Yount an

email to follow up because she had not heard anything, and on January 9, 2013, Yount

responded that she could not find anything in the file. Id. at 40:8–13; 45:3–8.

Ms. Ruth was served with the suit papers on January 8, 2013 and now claims that

she gave Dumez the suit papers that day. ECF No. 179 Ex. 2, Ms. Ruth Aff. ¶ 30.

However, during her deposition, Ms. Ruth testified:

---

[14] The only words from the notice provisions that could even conceivably be misconstrued are the words "we" and "us." However, Founders's name is on the front page of the Policy in bold, capital letters. Clearly, Founders issued the Policy. "'When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used.'" USAA Prop., 661 S.E.2d at 797 (quoting B.L.G. Enters, 514 S.E.2d at 330). Therefore, the court finds that the notice provisions are unambiguous and require the Ruths to give notice directly to Founders as provided under the Policy.

**Question**: When you first sent the fax in to Miss Dumez did you have a follow-up phone call to talk about it?

**Answer**: May have. I'm not sure. I don't remember.

**Question**: And then you said the next communication you had with Miss Dumez about what you called the Manny case was not until May?

**Answer**: Correct.

**Question**: And in the interim period in January you personally were served with a summons and complaint regarding Manny's injury case?

**Answer**: Yes. . . .

**Question**: When you were served did you physically turn over that summons and complaint or sent it or provide it to anyone else?

**Answer**: The only way I can answer that question is evidently I did not. I thought I had, but I must not have because in further following conversations with [Dumez] she said she never received anything from me.

ECF No. 157 Ex. 4, Ms. Ruth Dep. 42:5–43:3.

Similarly, Dumez testified:

**Question**: In between January 9th, 2013 and May 14th, 2013 did you receive any other communications from anyone about the incident that Attorney Akim had sent you the letter about?

**Answer**: No.

**Question**: Had you spoken to the Ruths in that intervening period between January 9th and May 14th about the Kehagias matter?

**Answer**: No.

**Question**: Had you learned in that intervening four months and five days that there had been a lawsuit filed against the bar?

**Answer**: No.

**Question**: Did you learn that the Ruths had been served with a lawsuit at any point during that four-month period?

**Answer**: No. . . .

**Question**:  Are you positive that at no time during this period did Mr. Ruth or Mrs. Ruth ever tell you that they had been served with a lawsuit?

**Answer**:  I am positive.  I did not hear about that until many months later, as we   can see through the documentation here.

ECF No. 166 Ex. 1, at 9, Dumez Dep. 51:21–52:25.

Since her deposition, Ms. Ruth has submitted an affidavit to the court, as an exhibit to the response in opposition to Founders's motion for summary judgment, dated November 11, 2015.  ECF No. 179, Ex. 2, Ms. Ruth Aff.  In her affidavit, Ms. Ruth states the following in reference to her previous statements when asked what she did with the suit papers:  "I was quite sure I had given everything to Ms. Dumez, but that I could not remember with 100% accuracy."  Id. ¶ 18.  She also stated:  "I have also said many times that it has always been my practice to give legal papers to Ms. Dumez, and that I had done it many times in the past and could not think of any reason why I would not have done it with Mr. Kehagias'[s] suit papers."  Id. ¶ 19.  Ms. Ruth further stated that since her previous statements, she has had the opportunity to reflect and recollect on what she did with the suit papers and has been provided information to refresh her memory, including phone records and emails.  Id. ¶¶ 21–29.  According to her affidavit, "[she] can now say that [she] met with Ms. Dumez after [she] was served with the suit papers, and that [she] gave the suit papers to her at that time."  Id. ¶ 30.

Founders requests that the court disregard Ms. Ruth's affidavit because it is procedurally improper.  ECF No. 123, at 8.  It is well established in this and other jurisdictions that an affidavit contradicting prior testimony cannot be used to create an issue of fact precluding summary judgment.  In Barwick v. Celotex Corp., 736 F.2d 946

(4th Cir. 1984), the Fourth Circuit Court of Appeals considered a situation in which a

plaintiff, when faced with a summary judgment motion, submitted an affidavit that

contradicted his prior sworn deposition testimony.  The Fourth Circuit noted as follows:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.  A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

Barwick, 736 F.2d at 960 (internal quotations and citations omitted) (emphasis added);

see also Alba v. Merrill Lynch & Co., 198 F. App'x 288, 300 (4th Cir. 2006) ("[A]

plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with

earlier deposition testimony."); Ins. Prods. Mktg., Inc. v. Conseco Life Ins. Co., 2012 WL

3308368, at *7 (D.S.C. Aug. 13, 2012) (refusing to consider affidavit supplied in

response to defendant's motion for summary judgment, in which plaintiff's expert altered

his earlier deposition testimony, because the statements in the affidavit materially and

directly contradicted the prior sworn statements).

Further, the court finds the circumstances surrounding Ms. Ruth's affidavit

suspect.  Ms. Ruth submitted the affidavit on November 11, 2015, long after she assigned

her right to sue to Kehagias in exchange for a covenant not to execute and after providing

contradicting testimony in two prior depositions.  Dumez testified that she never received

the papers and her file on the matter did not contain the summons and complaint.  Dumez

Dep. 14–15.  Clarissa Reed, a Hull agent, denies receipt of the summons and complaint,

and the suit papers are not included in her file.  Reed Dep. 68:7–15 ("I found no evidence

that the Summons and Complaint was given to Hull until November [2013].").

Therefore, the court disregards Ms. Ruth's affidavit that materially and directly contradicts her prior deposition testimony, a prior sworn affidavit submitted to the state court, and other evidence in the record, as the sole basis for finding a genuine dispute of material fact.

Nevertheless, Kehagias argues that, beyond Ms. Ruth's affidavit, phone records, and other evidence in the record indicate that Ms. Ruth notified Dumez. On January 9, 2013, Ms. Ruth apparently called Dumez.[15]  ECF No. 180, Ex. 3. That same day, Dumez sent an email to Yount at Hull and stated: "[T]here is yet . . . another one for an assault and battery claim that happened in 2012. That is the biggie we are worried about." Id. Ex. 10. Ms. Ruth called Dumez again on January 13, 2013. Id. Ex. 3. Founders's claim file demonstrates that on May 16, 2013, claim adjuster Ortiz entered a note in the claim file that he called the Ruths and they told him that they forwarded the paperwork to their insurance agent, Dumez. Id. Ex. 4. Ortiz then received a call from Dumez who told him that she reported the incident to Yount at Hull. Id.

Regardless of whether the court considers the affidavit or whether Ms. Ruth notified Dumez, there is no dispute that the Ruths failed to comply with the specific and unambiguous notice provisions in the Policy, which required the Ruths to provide notice

---

[15] Although Kehagias attaches two pages of phone records to his response, there is no indication of Ms. Ruth's phone number or Ms. Dumez's phone number on the records. Founders's claim notes do state the Ruths' home number; however, the court cannot confirm the precise call history. Further, in her affidavit, Ms. Ruth explained that Dumez handles all of Richard's Bar's insurance needs and has done so for years. Kehagias's Resp. Ex. 2, ¶ 6. Ms. Ruth further testified that the Kehagias matter was not the first claim with Founders. Id. ¶ 9. Ms. Ruth states that Dumez is a personal friend and that they talk often. Id. ¶ 7–8. Therefore, even if the court could confirm that Ms. Ruth spoke with Dumez numerous times during the period in which Ms. Ruth was served, standing alone, the phone records do not create a genuine issue of material fact that Ms. Ruth notified Founders as required under the Policy, as fully set forth below.

directly to Founders.  The GL portion of the Policy states that the Ruths must notify Founders as soon as practicable, while the LL portion states that the Ruths must notify Founders within seventy-two hours.  Founders received notice of the claim on May 15, 2013, more than six months after the Ruths received a letter from Kehagias's attorney, four months after being served, and almost eight months after the incident occurred. "Where a notification provision is to be enforced, the court will interpret the term 'as soon as practicable,' as meaning within a reasonable time frame." Vt. Mut. Ins., 446 S.E.2d at 422 ("The record offers no evidence of whether the four-month delay was unreasonable or that Vermont did not receive any other notice.").  Given the severity of the injuries, the court finds the delay unreasonable.  And the delay certainly does not fall within the seventy-two-hour window provided under the LL Policy.  Most importantly, Kehagias conceded that the Ruths did not notify Founders directly in accordance with the insurance Policy during the December 14, 2015 hearing.  Hr'g Tr. 3:9–17 ("The Court: Everybody agrees that the Ruths did not notify Founders direct in accordance with the insurance policy . . . .?  Answer:  Correct.  They don't call the phone number.  The Court: Or any other way?  Because they worked through their agent.  Okay.").  Therefore, although there may be a genuine issue of material fact as to whether Ms. Ruth gave Dumez notice of the suit papers, such notice would not have been sufficient under the terms of the Policy.  Accordingly, the Ruths failed to comply with the unambiguous language of the notice provisions in the Policy.

Therefore, the court holds that the Ruths failed to provide Founders proper notice as required under the Policy.  The court must next determine whether Founders was substantially prejudiced by the lack of proper notice.

i.    **Agency Issues**

Although the parties only briefly discuss the potential agency issues in the briefing related to the bad faith claim, the court finds it necessary to address them here. In South Carolina, "[a] party asserting agency as a basis of liability must prove the existence of the agency, and the agency must be clearly established by the facts."  Orphan Aid Soc'y v. Jenkins, 362 S.E.2d 885, 887 (S.C. Ct. App. 1987) (quoting McCall v. Finley, 362 S.E.2d 26 (S.C. Ct. App. 1987)).  "It is the duty of one dealing with an agent to use due care to ascertain the scope of the agent's authority.  Id.  "An agent's authority is composed of his or her actual authority, whether express or implied, together with the apparent authority which the principal by his or her conduct is precluded from denying. Thus, an agent's authority must be either expressed, implied, or apparent."  Roberson v. S. Fin. of S.C., Inc., 615 S.E.2d 112, 115 (S.C. 2005).  "While actual authority is expressly conferred upon the agent by the principal, apparent authority is when the principal knowingly permits the agent to exercise authority, or the principal holds the agent out as possessing such authority."  Id. (citing Moore v. North Am. Van Lines, 423 S.E.2d 116, 118 (S.C. 1992)).

Under South Carolina law, notice to the insured's agent may constitute notice to the insurer if the agent acquired knowledge within the scope of his agency relationship with the insurer.  See, e.g., W. Heritage Ins. v. Giuliani, 38 F. App'x 974, 978 (4th Cir. 2002); Noisette v. Ismail, 384 S.E.2d 310, 315 (S.C. Ct. App. 1989), rev'd on other grounds, 403 S.E.2d 122 (S.C. 1991) ("Because [the insurance agent] was still [the insurance company's] agent on the date [the insured] notified [the agent] of the accident, [the insured's] notice to [the agent] constituted notice to the insurer]."); Rogers v.

Atlantic Life Ins. Co., 133 S.E. 215 (S.C. 1926) (the knowledge of an insurance agent acquired within the scope of his agency is imputable to the insurance company). However, there must be evidence that the insured's agent is the insurance company's agent for purposes of notice. For example, in Guiliani, a customer who was injured in an accident after leaving a bar sued the bar for the injuries he sustained as a result of the bar over serving him. Id. at 975. The bar owner forwarded the complaint to his insurance agent, Moore & Associates, which had procured the bar's general liability policy from Western Heritage and liquor liability policy from Agora Syndicate, Inc. ("Agora"). Id. at 976. Moore & Associates forwarded the legal documents to Agora but not to Western Heritage. Id. Over a year later, Moore & Associates notified Western Heritage. Id. The court recognized that although notice to the insured's agent constitutes notice, "it is unclear from the record in this case whether Moore & Associates was Western Heritage's agent for the purpose of receiving notice of claims." Id. at 978–79. In determining whether there was evidence of an agency relationship between Moore & Associates and Western Heritage, the court stated that:

> There is nothing in the record that establishes this agency relationship. Indeed, the Western Heritage policy lists "the Kimbrell Company, Inc." as its agent, not Moore & Associates. On the other hand, Moore & Associates is printed at the bottom of several change endorsements that are included in the policy.

Id. at 979. The court found, however, that it "need not . . . decide whether Moore & Associates was Western Heritage's agent because Western Heritage received actual notice of the Giuliani suit on April 4, 1997, three years before the case went to trial." Id. Therefore, the court agreed with the trial court that Western Heritage had not demonstrated substantial prejudice because of this initial delay. Id. ("[W]e reject

Western Heritage's contention that [the bar and its owner] should be denied coverage under its policy based on the 17-month delay in receiving notice, particularly when Western Heritage had three years thereafter to mitigate the potential prejudice that it now claims.").

Similarly, although the policy lists Hull as the "producer," there is absolutely no evidence that Dumez was Founders's agent for purposes of notice.[16]  ECF No. 166 Ex. 2. There is no evidence that Founders held out Dumez as having the apparent authority to accept notice of its insured's claims.  Rather, Dumez was the Ruths' agent.  Founders does not have any retail agents in South Carolina.  Dumez testified that she did not "deal directly with Founders" and that there was no formal agreement of any kind between her and Founders.  Dumez Dep. 19:6–1 ("I don't deal directly with Founders.  I deal with Hull & Company who is the, I guess they're the broker or the wholesaler.  They are my contact to Founders.").  Dumez dealt exclusively with Hull, which functioned as a wholesaler or intermediary for the sale of the Policy in question.  Lastly, although there is evidence that Hull received the initial notice letter, there is absolutely no evidence that Hull received the suit papers.  Therefore, even if Hull were Founders's agent for purposes of receiving notice, Hull never received the suit papers and the record of devoid of any evidence that Hull sent the suit papers to Founders.

Citing the evidence that Ms. Ruth called Dumez, Kehagias argues that Ms. Ruth did provide notice and is thereby making an agency argument, even if inadvertently.

---

[16] The Producer Agreement between Founders and Hull required Hull to "immediately following receipt, notify [Founders] in writing of any loss or claim against any policy of insurance issued by [Founders]."  ECF No. 166 Ex. 4, at 4.  Although Hull's failure to do so may be a breach of their agreement, such provision does not conclusively establish that Hull was Founders's agent for purposes of receiving notice.

However, Kehagias does not argue that Ms. Ruth notified <u>Founders</u>.  Further, as discussed in the preceding section, the court examines the notice issue more as a matter of contract rather than agency.  The insurance policy is a contract that contains unambiguous notice requirements.  The Ruths clearly breached their obligation to provide notice as outlined in the Policy.  Thus, while the agency implications are not dispositive to the issue of notice, the court holds that the Ruths have failed to demonstrate any evidence that Dumez was Founders's agent for purposes of notice such that her receipt of the suit papers would constitute adequate notice.

### B.    Substantial Prejudice

Kehagias argues that coverage cannot be avoided for alleged late notice because Founders has failed to establish substantial prejudice as a matter of law.  ECF No. 155, at 4.

An insurer who seeks to avoid coverage for lack of notice must demonstrate "substantial prejudice to the insurer's rights before recovery is barred."  <u>Episcopal Church</u>, 53 F. Supp. 3d at 828; <u>see also</u> <u>Factory Mut. Liab. Ins. Co. of Am. v. Kennedy</u>, 182 S.E.2d 727, 729–30 (S.C. 1971) (holding that "in an action affecting the rights of innocent third parties under an automobile liability insurance policy, the noncompliance by the insured with policy provisions as to notice and forwarding suit papers will not bar recovery, unless the insurer shows that the failure to give such notice has resulted in substantial prejudice to its rights").  "The burden of proof is upon the insurer to show not only that the insured has failed to perform the terms and conditions invoked upon him by the policy contract but in addition that it was substantially prejudiced thereby."  <u>Squires</u>, 145 S.E.2d at 677.

Founders contends that it suffered substantial prejudice because it lost its ability to contest liability and was put in an adverse position to negotiate a settlement given the prior entry of default. Founders avers that Richard's Bar had reasonable liability defenses, including that the attack was sudden and unprovoked, there was very little evidence of alcohol use, and the assailant was a regular at the bar and although he caused some trouble in the past, he had never been violent. In support of its arguments, Founders cites Squalls's testimony, the primary adjuster on the claim. Squalls Dep. 91:2–92:6 ("[W]e would have had an opportunity to gather information. We would have been able to gather medical information and handle the claim in the manner in which it would be normally handled. . . . We are looking at the fact that a decision had already been rendered, and there was no opportunity to handle the case in a normal manner. . . . I would prefer to negotiate a case with a plaintiff who still had to prove the case on its merits."). Further, Kehagias refused to vacate the entry of default and resisted Founders's efforts to have it set aside. Thereafter, the Ruths directed Founders to dismiss the appeal. Founders argues that it therefore suffered substantial prejudice.

Kehagias argues that even if Founders indeed did not receive notice until May 2013, it cannot avoid coverage because it did not suffer substantial prejudice as a matter of law. Kehagaias Mot. Summ. J. 12. Kehagias contends that because the default judgment was not entered until April 29, 2014,[17] more than a year after the entry of default and almost a year after receiving notice, Founders did not suffer substantial prejudice, as they had plenty of time to negotiate a settlement. Id. In response, Founders

---

[17] In the briefing, Kehagias states that the final default judgment was entered in November 6, 2013. ECF No. 180, 5. However, Judge Newman's order is dated April 29, 2014, and the state court docket reflects that date as the entry of the default judgment.

argues that:  (1) South Carolina courts hold that, as a matter of law, insurance coverage is obviated when a default enters due to the insured's failure to send suit papers to the insurer; (2) the entry of default weakened Founders's position to negotiate and inhibited the ability to resolve the underlying claim; and (3) Founders never had the opportunity to settle within the Policy's limits.  Founders's Resp. 8–14.  In reply, Kehagias argues that Founders did not suffer substantial prejudice as a matter of law because:  (1) it had the opportunity to negotiate a settlement after the entry of default; (2) the prior entry of default had no effect on the manner in which Founders adjusted the claim; and (3) Founders had an opportunity to settle the claim within Policy limits.

Founders argues that it has suffered substantial prejudice because the entry of default prior to notice is substantial prejudice as a matter of law in South Carolina.  In support of its argument, Founders cites Merit Insurance Co. v. Koza, 264 S.E.2d 146 (S.C. 1980).  In Koza, an insurance company brought a declaratory judgment action against its insured seeking the court's declaration that it was not required to indemnify the insured for damages sustained after an automobile accident because the insured failed to comply with a policy provision that required the insured to forward suit papers to the insured.  Id.  Although the insurance company had learned of the automobile accident subject to the underlying tort claim, the insured never forwarded the suit papers to the insurer.  Id. at 147.  A default judgment was entered against the insured.  Id.  The court found that "prejudice is clearly established by the fact that a default judgment was entered against the insured."  Id. (citing Hargrove v. CNA Ins. Grp., 323 A.2d 785 (Pa. 1974)) (emphasis added).  While it is clear from Koza that the entry of a default judgment

establishes substantial prejudice, Founders received the legal documents in this case after the entry of default but <u>before</u> the court entered a default judgment.

Founders also cites <u>Hatchett v. Nationwide Mutual Ins. Co.</u>, 137 S.E.2d 608, 609 (S.C. 1964).  In <u>Hatchett</u>, the plaintiff-insured had uninsured motorist coverage with Nationwide and was involved in an accident.  <u>Id.</u> at 609.  He filed suit against the driver, an uninsured motorist, three months after the accident.  <u>Id.</u>  One month after filing suit, the insured notified his insurer of the suit and sent a copy of the summons and complaint with an accompanying letter stating that the driver was in default but that the insured would have no objection if the insurer wished to intervene.  <u>Id.</u> at 610.  The insured refused to waive the default and permit an answer to be filed on behalf of the driver.  <u>Id.</u> At that point, the insurer notified the insured that it was no longer interested in the matter. <u>Id.</u>

The underlying tort action against the uninsured driver went to trial, and a jury returned a verdict in the insured's favor for $10,000.00.  <u>Id.</u>  The insurer refused to pay for the amount of the default judgment, and the insured brought an action seeking coverage.  <u>Id.</u>  The insurer denied liability on the grounds that the insured had failed to comply with the terms of the insurance policy, that full compliance is a condition precedent to any action against the insurer, and that the insured failed to give notice of the accident as soon as practicable.  <u>Id.</u>  After the trial court directed verdict for the insured, the insurer appealed.  <u>Id.</u> at 609.  The South Carolina Supreme Court recognized that

> No effort was made to establish a reason for plaintiff's failure to comply with the terms of the contract.  Furthermore, plaintiff refused to waive the default and permit an answer to be filed in behalf of the defendant in the tort action.  He chose to rest his position upon the rights he had acquired

through default which operated to the prejudice of the insurance company. <u>It was in large measure deprived of the opportunity, which compliance by plaintiff would have afforded, to investigate promptly, to negotiate a settlement without the handicap of a default position, or to sponsor the defense of the uninsured motorist, thereby insuring that the amount which plaintiff 'shall be legally entitled to recover' be fairly established.</u>

<u>Id.</u> at 613.  The court reversed and remanded the judgment.  <u>Id.</u>

The court finds a recent Fourth Circuit opinion instructive on the issue of substantial prejudice.  In <u>St. Paul Mercury Insurance Co. v. Amercican Bank Holdings, Inc.</u>, ___ F.3d ___, 2016 WL 1459517, at *1 (4th Cir. Apr. 14, 2016), the insured, American Bank Holdings, Inc. ("American"), was served with a summons and complaint on June 18, 2008 via its registered agent.  The following day, the agent transmitted the papers to American's office, addressed to its CFO, in accordance with American's standing instructions.  <u>Id.</u>  However, the CFO no longer worked for American.  <u>Id.</u>  In late July, an officer of an American subsidiary came across the papers and sent them to American's local lawyer, but the lawyer claimed that he never received them.  <u>Id.</u>  Due to this "internal oversight," American did not respond to the summons and complaint, and the court entered a default judgment on July 23, 2008.  <u>Id.</u>  American notified its insurer, St. Paul Mercury Insurance Company ("St. Paul"), of the lawsuit on February 25, 2009, some eight months after receipt of the summons and complaint.  <u>Id.</u> at *2.  St. Paul denied coverage due to late notice and continued to deny coverage despite American's demand that it settle the suit within policy limits.  <u>Id.</u>  Although American was thereafter able to have the lawsuit dismissed, it expended approximately $1.8 million in defending the suit.  <u>Id.</u>  St. Paul filed a declaratory judgment action seeking to obtain a declaration from the court that it did not have to pay for American's defense.  <u>Id.</u> at *3.  American filed a counterclaim for a declaratory judgment that St. Paul must reimburse the cost of

the defense and also advanced theories of waiver and estoppel.  Id.  American further asserted a Maryland statutory claim for lack of good faith.  Id.

The Fourth Circuit first found that American failed to comply with the requirements in the policy to provide notice as soon as practicable.  Id. at *6 (holding that when American's agent was served on June 18, 2008, its duty to notify St. Paul was triggered and stating that "[n]o one can credibly argue that [the eight-month] lapse of time was 'as soon as practicable'").  The court then addressed whether American's failure to provide notice as required under the policy caused St. Paul "actual prejudice."  Id.[18] The court found that American's late notice denied St. Paul the opportunity to invoke its rights under the insurance contract, namely to participate in the selection of counsel, to speak with counsel, and to discuss credible defense strategies for dismissing the suit before the default judgment.  Id. at *7.  The court also noted that St. Paul was not able to involve itself in considering the possibility of settlement negotiations prior to the default judgment and prior to the expenditure American undertook to vacate it.  Id.  The court held that "[w]hen a late notice precludes an insurer from exercising meaningful contractual rights provided to it by the policy . . . the insurer has suffered actual prejudice."  Id.

---

[18] Notably, the statutory standard to avoid coverage under Maryland law is actual prejudice, while the standard under South Carolina law is substantial prejudice.  See Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co., 767 A.2d 831, 844 (Md. Ct. App. 2001) (the Maryland Court of Appeals interpreted the prejudice requirement to hold that the insurer suffered actual prejudice when "there was a credible defense to be presented and . . . [the insured's] non-cooperation precluded [the insurer] from even presenting that defense").  The court applies the Fourth Circuit's discussion in St. Paul not as a direct corollary, but as reasoning from which the court can discern the holding's applicability to the facts of this case and the law of South Carolina as persuasive authority.

Keeping in mind that Maryland's actual prejudice standard is not identical to South Carolina's substantial prejudice standard, the Fourth Circuit's reasoning and holding in <u>St. Paul</u> provides this court guidance. Founders was denied the opportunity to invoke its rights under the insurance policy to obtain copies of the legal papers, records, and other information, to investigate with the cooperation of the insured, and to settle the claim. <u>See</u> ECF No. 157 Ex. 56, at 15 (The GL and LL portions of the Policy state that the insured must authorize Founders to obtain records and other information and "[c]ooperate with [Founders] in the investigation or settlement of the claim or defense . . . ."); <u>see also</u> ECF No. 168 Ex. B, Ex. C. By being unable to assert its contractual rights in a timely matter, Founders suffered prejudice. <u>See</u> <u>Karnofsky v. Mass. Mut. Life Ins. Co.</u>, No. 2:14-cv-949, 2015 WL 8160793, at *5 (D.S.C. Dec. 7, 2015) (concluding that the insurer was prejudiced by the insured's failure to provide notice because "Plaintiff's policy included rights that, due to Plaintiff's delay, Defendant was unable to assert in a timely manner").

Further, like the insurance company in <u>Hatchett</u>, Founders did not receive notice of the claim until after the entry of default. Founders did not have the opportunity to investigate the claim, assert defenses to liability, or "negotiate a settlement without the handicap of a default position." <u>Hatchett</u>, 137 S.E.2d at 613; compare <u>Berenyi, Inc. v. Landmark Am. Ins. Co.</u>, No. 2:09-cv-01556, 2010 WL 233861, at *7 (D.S.C. Jan. 14, 2010) ("The court also finds that [the insurer] has failed to meet its burden of showing that it has been substantially prejudiced by any delay in [the insured's] notification of the Claim. As stated by [the insured], [the insurer] has been provided sufficient time to investigate the facts and to prepare a defense; <u>that no default judgment has been entered</u>;

and that until [the insurer] denied a defense to [the insured], it had defended the action, controlled the litigation, and hired experts.") (emphasis added). Kehagias refused to vacate the entry of default and opposed Founders's motion to set aside the entry of default. Instead, Kehagias chose to rely on the rights he acquired through the default process. The court finds that there can be but one inference from the evidence: The Ruths' failure to provide notice caused Founders substantial prejudice.[19]

Therefore, because the Ruths breached their duty to notify Founders, causing Founders substantial prejudice, Founders is relieved of its duty to provide coverage. The court grants Founders's motion for summary judgment in the declaratory judgment action, ECF No. 159, and denies Kehagias's motion for summary judgment, ECF No. 155.

### C.    Validity of the Assignment – Founders's Affirmative Defense

Kehagias next argues that the Ruths' assignment to Kehagias was valid. ECF No. 155, at 15. In response, Founders argues that the assignment was not valid because Kehagias and the Ruths colluded with each other. ECF No. 183, 14. On April 29, 2016, Founders filed a supplemental response in opposition to Kehagias's motion for summary judgment. ECF No. 139. Founders filed an additional supplemental response on May 5, 2016. ECF No. 140. On May 9, 2016, Kehagias filed a reply to Founders's supplemental response. ECF No. 141. The supplemental filings address Founders's arguments and

---

[19] Kehagias also argues that Founders did not suffer substantial prejudice because it had the opportunity to settle for the Policy limits. The court will address this issue more fully in the order regarding the bad faith claim. However, Kehagias's attorney believed that the policy limits were $1,005,000.00 when he sent the offer of compromise. Therefore, the record reflects that there was no meeting of the minds as to a material terms of the contract, and Founders did not have a reasonable opportunity to settle within the policy limits.

counterclaims that the Ruths colluded with Kehagias against Founders's interests. Founders argues that the additional evidence of collusion supports its position that Kehagias is not entitled to judgment as a matter of law on the issues of the validity of the assignment. ECF No. 139, at 2.

Founders contends that "[t]he recently produced documents raise further questions of fact as to whether the Ruths complied with the terms of the Founders Policy, breached their duty to act in good faith, and/or colluded with Kehagias against the interests of Founders." ECF No. 139, at 6.[20] Specifically, Founders contends that there is evidence that the Ruths worked closely with Kehagias's attorney prior to entering into the Assignment. Id. at 9. Founders cites evidence of communications between Kehagias's and the Ruths' respective attorneys more than four months prior to the assignment, during which time Founders was defending the Ruths in the underlying state court action. Id. In an email exchange, the attorneys discuss meeting to "coordinate [their] defenses." ECF No. 139 Ex. G, Ex. H. The Ruths' attorney first received a copy of the Assignment on March 17, 2014. Id. Ex. J. The parties continued to negotiate the Assignment while Founders was defending the Ruths in the underlying action, specifically trying to get the entry of default set aside. Id. Ex. K. Founders also points to communications regarding the Ruths' cooperation and desire to appeal the order denying their motion to set aside the default, arguing that they indeed had no intention of seeing the appeal through

---

[20] Founders initially asserted that Kehagias's counsel referred or steered the Ruths to their counsel, the Lawton Law Firm. See ECF No. 139, at 6–8. However, Founders has since withdrawn their assertion. Founders nevertheless maintains that evidence produced "supports their contention that Kehagias and the Ruths colluded by entering into a secret assignment of claims while the lawsuit between them was still pending and by taking actions . . . in derogation of the Ruths' duties under the policy and of the interest and rights of Founders." ECF No. 140, at 2.

conclusion.  See id. Ex. F.  Founders argues that the aforementioned evidence establishes

that the Ruths breached their duties of good faith and to cooperate in their defense.  ECF

No. 139, at 12.

In support of this claim, Founders cites a recent South Carolina Supreme Court

case in which the court considered the validity of an assignment between a tortfeasor

insured and an injured party.  In Skipper v. ACE Prop. & Cas. Ins. Co., 775 S.E.2d 37, 54

(S.C. 2015), a man was in an accident with a logging truck.  The owner of the logging

truck had a commercial automobile insurance policy with a $1,000,000 per occurrence

limit.  Id.  The injured driver retained an attorney who wrote a demand letter to the

insurance company to settle the case for the policy limits.  Id.  The insurance company

retained two lawyers to represent the owner and the driver of the truck.  Id.  The owner

and the driver, through the insurance company retained attorneys, offered the injured

driver $50,000.  Id.  The injured driver filed a lawsuit against the driver and owner of the

truck.  Id. at 38.  Unbeknownst to the insurance company or its attorneys, the injured

driver entered into a settlement with the driver and owner of the truck in which the owner

and driver agreed to admit liability and execute a confession of judgment for $4,500,000.

Id.  They also agreed to pursue a legal malpractice claim against the insurance company

and its attorneys and assigned the interests in the claim to the injured driver.  Id.  The

injured driver agreed not to execute the judgment as long as the driver and owner of the

truck cooperated in the legal malpractice action.  Id.  The insurance company and its

attorneys argued that the assignment was not valid.  Id.

The district court certified the following question to the South Carolina Supreme

Court:  Can a legal malpractice claim be assigned between adversaries in litigation in

which the alleged legal malpractice arose?  Id.  The court followed the majority rule and found such assignments void as against public policy, recognizing the strong risk of collusion.  Id.

Founders argues that although Skipper involved a legal malpractice action, the reasoning in Skipper is instructive and applicable here because there is evidence of collusion between the Ruths and Kehagias.  ECF No. 181, at 16.  Specifically, the Ruths demanded that Founders appeal the underlying judgment and suggested that the failure to do so would constitute bad faith.  However, the very next day, the Ruths executed the Assignment, which they had allegedly been discussing with Kehagias for some time. Thereafter, the Ruths demanded that Founders dismiss the appeal.  Further, the Ruths signed a "Release of Entire File" instructing the Ruths retained defense counsel in the underlying litigation to turn over his entire file to Kehagias, including privileged materials.  Founders also argues that the court's reasoning relating to the importance of maintaining the integrity of the attorney-client relationship applies to these circumstances because the insurer-insured relationship carries many heightened duties and confidences. Notwithstanding the foregoing, Founders argues that whether the Ruths and Kehagias colluded against the interests of Founders—and therefore whether the assignment was valid—is an issue of fact.

The court holds that to apply Skipper to this case would be an improper expansion of the law.  However, the court finds that there is evidence that creates a genuine dispute of material fact as to whether the Ruths breached their duties to act in good faith and cooperate with their defense.  In light of the court's holding that Founders is not required

to provide coverage under the Policy and is not liable for bad faith, the court need not dedicate extensive analysis to what is essentially an academic inquiry.

Nevertheless, given the genuine issue of material fact noted above, the court denies Kehagias's motion for summary judgment as to Founders's affirmative defense that the assignment is invalid.

### D.     The Ruths' Actions

Kehagias also seeks summary judgment as to Founders's counterclaims.  In its counterclaims, Founders alleges that the Ruths were negligent, acted in bad faith, and breached their duty of cooperation when they assigned their bad faith claims to Kehagias. Kehagias argues that the counterclaims are not supported by any evidence on the record or existing jurisprudence.  ECF No. 155, at 16.

Under South Carolina law, the question of whether the insured has met his obligation to cooperate is ordinarily one to be determined by the trier of fact.  Penn. Threshermen & Farmer's Mut. Cas. Ins. Co. v. Owens, 238 F.2d 549, 552 (4th Cir. 1956) (citing Walker v. New Amsterdam Cas. Co., 154 S.E. 221 (S.C. 1930)).  Founders alleges that the Ruths breached their duty to cooperate in their defense and acted in bad faith after the entry of default by:  (1) assigning their claims to Kehagias; (2) demanding that Founders appeal the default judgment and then demanding that Founders withdraw the appeal; and (3) authorizing the disclosure of defense counsel's privileged files to Kehagias while the underlying case remained open.  ECF No. 183, at 19; see also ECF No. 139, at 3.  Kehagias originally argued that summary judgment on Founders's counterclaims was premature because there were three outstanding discovery matters

related to these particular claims and defenses that preclude the entry of summary judgment; however, these matters have since been resolved.[21]

On April 21, 2016, Founders requested an opportunity to supplement its response in opposition to Kehagias's motion for summary judgment in light of the new discovery. The court allowed Founders to do so, and on April 29, 2016, Founders filed a supplemental opposition.  On May 5, Founders filed a second supplement.  On May 9, 2016, Kehagias filed a reply to Founders's supplemental briefing.

As outlined above, Founders contends that there is evidence that the Ruths worked closely with Kehagias's attorney prior to entering into the Assignment.  Id. at 9. Founders cites evidence of communications between Kehagias's and the Ruths' attorneys more than four months prior to the assignment, during which time Founders was defending the Ruths in the underlying state court action.  Id.  In the email exchange, the

---

[21] First, on May 15, 2015, Founders served a subpoena for the deposition of Attorney Erica McElreath, who served as the Ruths' personal counsel in connection with the appeal of the entry of default, the assignment of the Ruths' claims to Kehagias, and the production of defense counsel's file.  Founders also served a subpoena duces tecum seeking related documents from Attorney McElreath's firm.  McElreath and her firm filed a motion to quash, ECF No. 58, and Founders filed a response in opposition, ECF No. 65.  On February 8, 2016, the court granted in part and denied in part the motion and ordered Lawton Law Firm to comply with Founders's subpoena duces tecum.

Second, Founders served a subpoena duces tecum on May 18, 2015 seeking documents from the Anastopoulo Law Firm relating to their representation of Kehagias in the underlying action.  The subpoena sought documents related to Kehagias's procurement of the Assignment of the Ruths' claims against Founders, the handling of the Ruths' appeal, and the request for defense counsel's file.  Kehagias filed a motion to quash the subpoena duces tecum on May 22, 2015, ECF No. 57, and Founders filed an opposition.  On February 8, 2016, the court granted in part and denied in part the motion.

Lastly, Kehagias filed a motion for reconsideration of Judge Marchant's May 15, 2015 order in which he granted in part and denied in part Founders's motion to compel discovery.  On December 11, 2016, the court denied Kehagias's motion for reconsideration, thereby allowing discovery of:  (1) communications between Giannaras and the Ruths prior to May 28, 2014 (the date of the assignment); and (2) all drafts of prior versions of the Assignment.  Therefore, the outstanding discovery disputes have all been resolved.

attorneys discuss meeting to "coordinate [their] defenses."  ECF No. 139 Ex. G, Ex. H.

Further, the Ruths' attorney first received a copy of the Assignment on March 17, 2014.

Id. Ex. J.  The parties continued to negotiate the Assignment while Founders was

defending the Ruths in the underlying action, specifically trying to get the entry of default

set aside.  Id. Ex. K.  Founders also points to communications regarding the Ruths'

cooperation and desire to appeal the order denying their motion to set aside the default,

arguing that they indeed had no intention of seeing the appeal through conclusion.  See

id. Ex. F.  Founders argues that the aforementioned evidence establishes that the Ruths

breached their duty of good faith and their duty to cooperate in their defense.  ECF No.

139, at 12.

     The court finds that the aforementioned evidence creates a genuine issue of

material fact as to whether the Ruths met their obligation to cooperate in their defense.

See generelly Nichols v. State Farm Mut. Auto. Ins. Co., 306 S.E.2d 616, 618 (S.C. 1983)

(recognizing the "implied covenant of good faith and fair dealing that neither party will

do anything to impair the other's rights to receive benefits under the contract" (emphasis

added)); cf. Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 771 (D.S.C. 2006)

("Certainly, considering the evidence in a light most favorable to Allstate, a reasonable

juror could find that Mrs. Shiftlet's redaction of the Authorization and failure to complete

her EUO constituted a failure to cooperate.").

     **E.**    **Maximum Coverage Available**

     Alternatively, Founders asks the court in this motion to declare that the maximum

coverage available under the Policy is $105,000.00—$50,000.00 under the GL portion,

$50,000.00 under the LL portion, and $5,000.00 for Med-Pay.  During the December 14,

2016 hearing, the parties all stipulated to the court that the coverage in the Policy is $105,000.00.  Hr'g Tr. 4:21–25.  Therefore, the court holds that the maximum coverage under the policy is $105,000.00.[22]

**F.     Med-Pay**

Founders also contends that it is entitled to summary judgment on Kehagias's claim for the $5,000.00 Med-Pay coverage because Kehagias failed to meet the requirements under the Policy.  Coverage C under the GL form of the Policy contains Med-Pay coverage of $5,000.00, provided that "expenses are incurred and reported to us within one year of the date of the accident."  Ex. 56.  Founders argues that Kehagias failed to comply with this condition; however, Kehagias contends that he reported his medical expenses to Founders because the offer of compromise was accompanied by medical bills far exceeding $5,000.00.  ECF No. 180, at 10.

The Med-Pay coverage is also the subject of Kehagias's claim for gross negligence.  Kehagias made three separate requests for Med-Pay coverage on June 7, 2013, August, 9, 2013, and August 27, 2013, but it is unclear whether these requests were accompanied by evidence of Kehagias's medical expenses.  Giannaras testified that Founders "has procrastinated on the Med-Pay claim in order to induce a lower settlement of [Kehagias's] other claims in the underlying suit," has held the Med-Pay hostage to induce [Kehagias] to settle the underlying claim," and "represents a failure on the part of [Founders] in its duty wherein [Founders] has acted deliberately and intentionally to wear

---

[22] Notably, during the December 14, 2015 hearing, Founders's attorney represented to the court that "regardless of how the [c]ourt rules on summary judgment . . . that 105 will stay out there, and it will stay out there available to them if they will simply accept that and move on and dismiss this case with prejudice."  Hr'g Tr. 9:21–10:3.

down [Kehagias] and induce [Kehagias] to settle the underlying claim for less than to what he is entitled."   Giannaras Dep. 118

In a separate order relating to Founders's motion for summary judgment on Kehagias's misrepresentation and gross negligence counterclaims, ECF No. 164, the court concluded that there is no genuine issue of material fact as to whether Founders intentionally withheld the Med-Pay coverage in an effort to induce settlement. Founders's decision to withhold the coverage was reasonable in light of the Ruths' breach of the notice provisions.  Therefore, the court granted Founders's motion for summary judgment as it pertains to Kehagias's gross negligence counterclaim relating to the Med-Pay Coverage.

Kehagias's injury occurred on September 29, 2012.  On August 27, 2013, Kehagias's attorney sent an offer of compromise.  However, there were no medical bills attached to the offer.  Thus, there is no evidence that Kehagias reported the expenses within one year of the accident.  Therefore, the court grants Founders's motion for summary judgment as it pertains to the Med-Pay coverage.

### G.     Attorney's Fees and Punitive Damages

Kehagias also seeks summary judgment as to Founders's affirmative defense that the request for punitive damages and attorney's fees is unconstitutional.  Founders and Utica included the affirmative defense of unconstitutionality "to ensure that the constitutional protections provided by federal and South Carolina jurisprudence are applied."  ECF No. 181, at 32.  The court will allow Founders's affirmative defense to stand to the extent it wishes to preserve its rights.

## IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** Kehagias's motion for summary judgment and **GRANTS** Founders's motion for summary judgment.  Founders is not required to provide coverage under the Policy.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 8, 2016**
**Charleston, South Carolina**